UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**BOBBIE FISCHER SAPP,**

                  **Plaintiff,**

**v.**                                  **Case No: 6:21-cv-1515-PGB-DCI**

**JEFFREY MARCUM, JOHN
BOLOGNA, JESSICA ELLER,
DANIEL PUSHOR, DEAN
RICHARD JOHNSON and CITY
OF WINTER PARK,**

                  **Defendants.**

_____/

## ORDER

This cause is before the Court on the Defendants' Motion for Summary Judgment. (Doc. 51 (the "**Motion**")). The Plaintiff submitted her Response in Opposition (Doc. 68 (the "**Response**")), and the Defendants filed a Reply (Doc. 71).[1] Upon due consideration, the Defendants' Motion is granted as to all counts of the operative complaint in which the Defendants are named.[2]

---

[1]   The Court also considered the exhibits submitted by the parties in support of their respective positions. (Docs. 49, 50, 56, 66, 76).

[2]   It does not appear that Defendant Dean Johnson was ever properly served, and the Plaintiff has failed to prosecute her claim against him. (*See* Docs. 46, 48). Accordingly, Defendant Johnson was previously dismissed without prejudice for failure to prosecute in violation of Local Rule 1.10(b). (*See* Doc. 57, p. 2; *see also* Docs. 46, 48). In any case, the claim against Mr. Johnson is based in state common law, and the Court declines to exercise supplemental jurisdiction over Mr. Johnson. Accordingly, even if Mr. Johnson was served before removal, the case against him would be remanded to state court.

## I.      BACKGROUND

This litigation presents the question of whether Officers with the Winter Park Police Department acted properly when they entered a residence for a health and wellness check, encountered the Plaintiff in her bed, and responded with force when the Plaintiff pointed a firearm at the officers. (Doc. 26 ("**Third Amended Complaint**")).

The Plaintiff asserts Defendant Officer Marcum violated the Fourth Amendment by using excessive force, in violation of 42 U.S.C. § 1983 (Count I) and by seizing her without probable cause (Count II). (*Id.*). Next, the Plaintiff claims Defendant Officer Bologna violated the Fourth Amendment by using excessive force, by failing to intervene when Officer Marcum used unreasonable and excessive force, and by seizing her person without probable cause (Counts III, IV, and V).[3] (*Id.*). And the Plaintiff alleges that Defendants Officers Eller and Pushor violated the Fourth Amendment by participating in her unlawful seizure and by failing to intervene when Officers Marcum and Bologna allegedly used unlawful force (Counts VI, VII, VIII, and IX).[4] (*Id.*). The Plaintiff also asserts state-law claims against the City of Winter Park for assault (Count X) and battery (Counts XI, XII), and against Defendant Dean Johnson for malicious prosecution (Count XIII). (*Id.*). Finally, the Plaintiff sues the City of Winter Park for common law negligence (Count XIV). (*Id.*).

---

[3]    The Plaintiff misidentifies Count IV as Count V.

[4]    The Plaintiff failed to label Count IX.

The facts are not complex and are for the most part uncontested. The parties stipulate that Dean Johnson called 911 and reported that the Plaintiff was threatening suicide the prior night. (Doc. 49, ¶ 2). Mr. Johnson also reported the Plaintiff had threatened to have a "shootout with the cops" if they came to her home, and he claimed the Plaintiff had overdosed before with heroin and was armed with weapons. (*Id.*). Finally, Mr. Johnson claimed the Plaintiff had "threatened suicide by cop before," and he asserted she was violent the previous night, adding that their two dogs did not bark when he beat on the door. (*Id.*). The parties also stipulate that Officers Eller, Pushor, LT Bologna, and SGT Marcum were on-duty acting in their capacity as law enforcement officers employed by the City of Winter Park at all material times. (*Id.* ¶ 4). The officers responded to Mr. Johnson's 911 call and made entry into the home. (*Id.* ¶¶ 6–7). They encountered the Plaintiff lying in her bed. (*Id.* ¶ 8).

Here the agreement ends, and the dispute concerns how the Plaintiff acted once the officers entered her bedroom and before SGT Marcum fired a single shot striking the Plaintiff's right shoulder. The Defendants[5] contend they are entitled to qualified immunity and Florida statutory immunity and that their conduct was entirely proper and did not violate clearly established statutory or constitutional rights. (Doc. 51, p. 7). The Defendants argue there was probable cause to believe the Plaintiff was a danger to herself, and that the use of force—both the deployment

---

[5] When the Court refers to "the Defendants," only the law enforcement officers and the City of Winter Park are included in the reference. As discussed above, the Plaintiff has not pursued her claim against Mr. Johnson, and he never answered the Third Amended Complaint.

of a Taser and the discharge of a service weapon—was proper because the Plaintiff pointed a firearm at the officers. (*Id.* at pp. 7–23). For the same reason, the Officers Eller and Pushor did not improperly fail to intervene in the use of force. (*Id.*). And for these reasons, the Defendants Marcum and Bologna are not liable for assault or battery under Florida law. (*Id.* at pp. 17–18). Finally, since the law enforcement Defendants did not violate the Plaintiff's statutory or constitutional rights or transgress Florida law, the City of Winter Park bears no liability. (*Id.* at pp. 23–26).

The Plaintiff flatly denies having raised her firearm or pointing it at the Defendants. (Doc. 66-1, ¶ 41). She repeats this denial in her Response to Defendants' Motion for Summary Judgment—"Ms. Sapp did not grab the gun, point the gun, wave the gun, or threaten the officers with harm." (Doc. 68, p. 5). And the Plaintiff claims her admission to the police that she pointed the firearm at the officers stems from pain medication. (*Id.* at p. 6). As it turns out, the Plaintiff's sworn representation in her affidavit is false and is contradicted by admissions she makes to her mother on recorded calls while in custody pending trial. (*See* Doc. 76-1, at 6:11, 6:15–6:26, 7:6, 8:25–27, 8:33–47).[6] The jail calls were submitted to the Court on May 4, 2023 (Doc. 76), and the Plaintiff's sworn affidavit is dated January 13, 2023. (Doc. 56-1, ¶ 34; Doc. 66-1, ¶ 44).

---

[6]   The recorded jail calls are at Docket Number 76-1 through 76-4. References to the relevant portions of the Plaintiff's conversations are denoted by minute and second. For example, 6:11 is six minutes, 11 seconds into the recording.

## II.   STANDARD OF REVIEW

A court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. FED. R. CIV. P. 56(c)(1)(A). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). "The court need consider only the cited materials" when resolving a motion for summary judgment. FED. R. CIV. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam) (holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).[7]

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most

---

[7] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). But, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## III.   DISCUSSION

### A.   Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions . . . from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Jacoby v. Baldwin County*, 835 F.3d 1338, 1343–44 (11th Cir. 2016) (quoting *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome an officer's qualified immunity defense, a plaintiff must show "the law that governs the case is 'clearly established' at the time of the alleged violation." *Piazza v. Jefferson County*, 923 F.3d 947, 955 (11th Cir. 2019). To qualify as "clearly established," the "legal principle must be 'settled' and 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). If the government officials were acting within the scope of their discretionary authority, then the plaintiff must show that qualified immunity is inappropriate by alleging facts that establish the government

officials violated his rights and by showing that those rights were clearly established at the time of the misconduct. *Jacoby*, 835 F.3d at 1344; *see Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."); *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). The court "ha[s] discretion to decide which of the two prongs of the qualified[] immunity analysis to tackle first," and the government officials are "entitled to qualified immunity if the plaintiff fails to establish either one." *al-Kidd*, 563 U.S. at 735; *Jacoby*, 835 F.3d at 1344. In the end, "[t]he critical question is whether the law gave the officer 'fair warning' that his conduct was unconstitutional." *Piazza*, 923 F.3d at 955 (quoting *Glasscox v. City of Argo*, 903 F.3d 1207, 1217–18 (11th Cir. 2018)).[8] The Court will first address whether Plaintiff's Fourth Amendment rights were violated as alleged and then whether those rights were clearly established at the time of the alleged shooting.

      *1.    Excessive Force Allegations*

     The Fourth Amendment protects against objectively unreasonable searches and seizures by the government. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Apprehension by deadly force constitutes a seizure." *Wilson v. Parker*, 746 F.

---

[8]   With regard to the state law claims, officers are entitled to statutory immunity when acting within the course and scope of their employment with respect to the alleged excessive use of force. *See City of Maitland v. Heatwole*, 546 So. 2d 63, 64 (Fla. 1st DCA 1989); FLA. STAT. § 768.28(9)(a).

App'x 860, 863 (11th Cir. 2018).[9] "Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quotation omitted). "No precise or 'rigid preconditions' exist for determining when an officer's use of deadly force is excessive." *Beckman v. Hamilton*, 732 F. App'x 737, 740 (11th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). Rather, courts must determine case-by-case whether the force used was objectively reasonable under the totality of the circumstances. *Graham*, 490 U.S. at 396; *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) ("Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, we must slosh our way through the fact bound morass of reasonableness.") (quotations, alterations, and citations omitted). However, "[i]n cases involving [allegations] of excessive force, it is doctrinal gospel that [courts] do not view an officer's actions with the 20/20 vision of hindsight." *Shaw v. City of Selma*, 884 F.3d 1093, 1101 (11th Cir. 2018); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) ("Our task is not to evaluate what the officers could or should have done in hindsight. The sole inquiry is whether the officer's actions, as taken, were objectively reasonable under all the circumstances."). Thus, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—

---

[9] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

To aid in this inquiry, the Supreme Court and the Eleventh Circuit have provided factors to guide courts in their determination of whether an officer's use of deadly force was objectively reasonable: (1) the severity of the crime or crimes at issue; (2) whether an officer has probable cause to believe either that the suspect poses a threat of serious physical harm to those at the scene or that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm; (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; (4) whether the suspect poses an immediate threat to the safety of the officers or others; (5) whether the officer reasonably believes the use of deadly force was necessary to prevent escape or prevent the suspect from inflicting further serious physical harm; or (6) whether the officers gave some warning about the possible use of deadly force, if feasible. *See Graham*, 490 U.S. at 396; *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985); *Spencer v. City of Orlando*, 725 F. App'x 928, 931 (11th Cir. 2018); *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016). Notably, "[a] mechanical application of these factors is not appropriate" because they are not "prerequisites to the lawful application of deadly force by an officer seizing a suspect" but instead only some contextual considerations that may apply differently in each circumstance. *See Scott*, 550 U.S.

at 382–83; *see also Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (citations and quotations omitted).

The Defendant Officers' use of force—both in deploying a Taser and when that failed discharging a service weapon—was objectively reasonable based on the totality of the circumstances. The Officers responded to a 911 and were informed by Mr. Johnson that the Plaintiff was threatening suicide the prior night. (Doc. 49, ¶ 2). Mr. Johnson also reported the Plaintiff had threatened to have a "shootout with the cops" if they came to her home, and he claimed the Plaintiff had overdosed before with heroin and was armed with weapons. (*Id.*). Finally, Mr. Johnson claimed the Plaintiff had "threatened suicide by cop before," and he asserted she was violent the previous night, adding that their two dogs did not bark when he beat on the door. (*Id.*). The parties do not dispute that Officers Eller, Pushor, LT Bologna, and SGT Marcum were on-duty acting in their capacity as law enforcement officers employed by the City of Winter Park at all material times. (*Id.* ¶ 4).

Upon entering the Plaintiff's residence, Officers announced "Winter Park Police." (Doc. 50-6, 84:21–85:1). In a recorded telephone call following her arrest, the Plaintiff acknowledges she "heard police or something." (Doc. 76-2, at 9:33–37). And the Plaintiff stated during a custodial interview that she thought Orlando Police Department had announced their presence after officers entered her home. (Doc. 56-17, at 6:15, 13:45). While the Plaintiff now claims she was incapacitated by pain medication such that her post-*Miranda* statements are unreliable (Doc.

66-1, ¶¶ 37–38, 41), the Plaintiff reaffirmed in a recorded jail call that she heard police announce their presence upon entering the residence. This admission is consistent with the testimony of SGT Marcum. (Doc. 50-3, 118:21–119:5).

The Plaintiff also concedes that she "recall[s] hearing a voice ask me to show my hands, and I did." (Doc. 66-1, ¶ 33). While the Plaintiff claims she believed that person to be Mr. Johnson and not the police, the inquiry is whether the Officers' conduct was objectively reasonable, and not the Plaintiff's state of mind. SGT Marcum also testified that the Plaintiff placed her left hand back under her covers and was again ordered to show the officers her hands. (Doc. 50-3, 140:9–17). SGT Marcum describes the Plaintiff as raising her hand from under the cover at which time the officers saw a firearm in her left hand. (*Id.* 141:6–16). The Plaintiff denies having raised her firearm or pointing it at any of the officers. (Doc. 66-1, ¶ 41). That said, the Plaintiff's sworn affidavit filed in response to the Defendants' Motion is contradicted by the recorded telephone conversations made by the Plaintiff from the jail.

The Plaintiff told her mother that "I never discharged my weapon, I had it pointed." (Doc. 76-1, at 6:11). She also tells her mother that the police report is wrong, because "I know what hand I had my gun in." (*Id.* at 7:06). When the Plaintiff questions why she is charged with attempted murder, her mother responded, "it's attempted murder because you pointed a gun at them." (*Id.* at 6:15–26). The Plaintiff does not correct her mother's summary of the events. Finally, the Plaintiff told her mother "I only had a weapon in my right hand . . .

because I was never gonna shoot it." (*Id.* at 8:25–47). The Plaintiff's telephonic statements made after her medical treatment was completed and thus untainted by pain medication mirror her post-*Miranda* admission that she pointed her weapon at the police.[10] (Doc. 56-17, at 21:47–22:25). Once the Plaintiff raised her firearm, she is directed to drop her weapon and LT Bologna stepped forward and deployed his taser, but it failed to complete the circuit and had no effect.[11] (Doc. 50-3, 141:16–20). SGT Marcum then fired a single shot, striking the Plaintiff's shoulder. (Doc. 49, ¶ 10).

Applying the factors announced by the Supreme Court and the Eleventh Circuit for determining whether an officer's use of deadly force was objectively reasonable, the Court finds both LT Bolonga and SGT Marcum's use of force passes the test. At the moment force was employed, the Plaintiff had committed serious felony offenses,[12] the officers had probable cause to believe the Plaintiff posed a threat of serous physical harm in that she disobeyed orders to show her hands and subsequently to drop her weapon, and the officers were reasonable in their belief

---

[10] The Court finds the Plaintiff's affidavit to the point that she denies having raised or pointed her firearm in the direction of the officers to be a sham affidavit. *See Santhuff v. Seitz*, 385 F. App'x 939, 944 (11th Cir. 2010). The Plaintiff's version of events as stated in paragraph 41 of her affidavit is contradicted by the record such that no reasonable jury could believe it, and so the Court declines to adopt the Plaintiff's statement on this issue in ruling on the Motion for Summary Judgment. *Scott*, 550 U.S. at 380.

[11] Even though the command to deploy a Taser had been given, an officer need not warn a suspect before using a Taser. *See Anthony v. Coffee County*, 579 F. App'x 760, 763 (11th Cir. 2014).

[12] *See, e.g.*, FLA. STAT. §§ 784.021(1)(a), 784.07(2)(c) (aggravated assault upon a law enforcement officer); FLA. STAT. §§ 777.04, 782.04, 775.087(1) (attempted murder); FLA. STAT. §§ 843.01, 775.087(1) (resisting an officer with violence and with a weapon).

that use of deadly force was necessary. *See Graham*, 490 U.S. at 396; *Garner*, 471 U.S. at 11–12; *Spencer*, 725 F. App'x at 931; *Perez*, 809 F.3d at 1222. As the Defendants correctly observe, when an officer is confronted by a suspect armed with a firearm that is available for use, the officer need not "wait and hope for the best" and instead may employ deadly force. *Powell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022).

The Plaintiff's reliance on *Teel v. Lozada*, 826 F. App'x 880, 886–87 (11th Cir. 2020), is misplaced. In *Teel*, the subject was armed with a knife and was not within striking distance of the officer who shot and killed the subject. *Id*. at 882–83. Moreover, unlike this case, the officer in *Teel* failed to instruct the subject to drop the weapon. *Id*. Also, unlike the subject in *Teel* who was reported to be suicidal, the Plaintiff here raised a firearm and pointed it at the officers imperiling their safety. Since the use of force by SGT Marcum and LT Bologna was lawful, they are entitled to qualified immunity.[13] Accordingly, Defendants Marcum and Bologna are entitled to summary judgment on Counts I and III, and the City of Winter Park is entitled to summary judgment on Counts XI and XII of the Third Amended Complaint.

---

[13] For the same reasons, the Defendant Officers are entitled to statutory immunity under Section 768.28(9)(a). SGT Marcum and LT Bologna's actions were objectively reasonable and therefore they did not act in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The Plaintiff concedes the applicability of statutory immunity by agreeing that the Officers were acting within the course and scope of their employment and by acknowledging that their use of force was not committed in bad faith or with malicious purpose. (Doc. 68, pp. 19–20).

2. *City of Winter Park — Assault*

The Plaintiff alleges the City of Winter Park is liable because SGT Marcum, LT Bologna, Officer Eller, and Officer Pushor intentionally and unlawfully threatened to cause bodily harm to her by pointing their Tasers and/or guns at her. (Doc. 26, ¶ 135). That is, the Plaintiff contends the officers assaulted her (Count X).

"[A] Florida municipality may be held liable for the intentional torts of its employees committed within the scope of their employment." *City of Miami v. Simpson*, 172 So. 2d 435, 436 (Fla. 1965). The Plaintiff contends Chief Michael Deal is vicariously liable for the intentional tort of *battery* perpetrated by SGT Marcum and LT Bologna. (Doc. 68, pp. 19–20). As the Defendants correctly note, Chief Deal is not a named defendant. (Doc. 71, p. 11). And this Court has concluded that the use of force was objectively reasonable, as such no intentional tort of battery occurred. Since the Defendant Officers acted in an objectively reasonable manner when they drew firearms and/or a Taser, there is no intentional tort of assault. Accordingly, the City of Winter Park is entitled to summary judgment on Count X.

3. *Failure to Intervene*

The Plaintiff sues LT Bologna (Count IV) and Officers Eller (Count VII) and Pushor (Count IX) for failing to intervene to stop the excessive use of force. (Doc. 26). More specifically, the Plaintiff alleges that LT Bologna should have intervened to stop SGT Marcum from the use of objectively unreasonable, unnecessary, and excessive force. (*Id.* ¶ 82). And the Plaintiff claims Officers Eller and Pushor should have intervened to prevent SGT Marcum and LT Bologna from their use of force.

(*Id.* ¶¶ 110, 129). These claims fail because failure-to-intervene relates to stopping an ongoing, clear excessive use of force. *See Hunter v. City of Leeds*, 941 F.3d 1265, 1282 (11th Cir. 2019) (indicating an officer can be liable under § 1983 for failing to intervene when a fellow officer uses excessive force and the officer fails to take reasonable steps to protect the victim); *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002). The Court has already determined there is no material issue of fact precluding the entry of summary judgment on the excessive use of force claims, and so the failure to intervene claims also fail.[14]

Accordingly, the Court grants summary judgment for LT Bologna (Count IV) and Officers Eller (Count VII) and Pushor (Count IX) on Plaintiff's failure-to-intervene claims. (Doc. 26).

### 4.  *Unlawful Seizure*

The Plaintiff asserts the following Defendants violated the Fourth Amendment's prohibition against unreasonable seizure by detaining her without probable cause: SGT Marcum (Count II), LT Bologna (Count V), Officer Eller (Count VI), and Officer Pushor (Count VIII). The issue is when was the Plaintiff seized and did the officers have probable cause to carry out the seizure. In the Third Amended Complaint, the Plaintiff generally alleges that Defendants "lacked probable cause to detain and seize [her] in her home and had no arguable probable

---

[14]  The failure to intervene to stop the use of excessive force presupposes there is a realistic opportunity to intervene. *See, e.g.*, *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996). The record lacks evidence that the Defendant Officers had time to intervene between the deployment of LT Bologna's Taser and the discharge of SGT Marcum's service firearm.

cause and/or information that a crime had been committed or was about to be committed." (Doc. 26, ¶¶ 63, 89, 101, 117). Yet the Plaintiff fails to identify the point in time when she was unlawfully detained or seized by the officers.

Turning to the factual allegations of the operative complaint, the Plaintiff recounts that officers "ask[ed] her to show her hands." (*Id.* ¶ 29). And the Plaintiff alleges Officer Pushor instructed Officer Eller to pull the comforter away from her body.[15] (*Id.* ¶ 30). The Plaintiff claims that once the comforter was pulled down, SGT Marcum drew his firearm and pointed it at her, and she concedes that the officers "noticed a gun near Plaintiff Sapp's right side." (*Id.*). The Plaintiff repeats her debunked claim that she "did not grab the gun or threaten the officers with it." (*Id.*). The Plaintiff further alleges that once inside her bedroom, all officers, except SGT Marcum, "holstered their guns and transitioned to Tasers but did not deploy them." (*Id.* ¶ 31). Finally, the Plaintiff asserts that upon seeing her gun, LT Bologna "called out Taser–Taser and pulled out his Taser and tased Plaintiff Sapp." (*Id.* ¶ 38).

In her Response to the Defendants' Motion for Summary Judgment, the Plaintiff again points to the removal of the comforter as the moment when the wellness check turned into an unlawful seizure. (Doc. 68, p. 23). The Plaintiff reasons as follows:

> They aggressively escalated what was to be a well-being check into the creation of a danger by disregarding her

---

[15] In the Stipulation of Agreed Material Facts for Summary Judgment, the parties stipulate that LT Bologna—not Officer Pushor—directed Officer Eller to pull the comforter off of the bed. (Doc. 49, ¶ 9).

> right to personal security and privacy when Officer
> Bologna ordered Eller to yank the covers from her bed. .
> . Based on the balancing test, the extraordinary manner
> in which the officers seized Ms. Sapp this creates a
> genuine issue of material fact that should be present [sic]
> to a jury.

(*Id.*).[16] Accordingly, the Plaintiff's generalized language in Count II, V, VI, and VIII must be construed in the context of the factual allegations of the Third Amended Complaint and her Response to the Defendants' Motion for Summary Judgment. As a result, the Court must analyze whether SGT Marcum's order to remove the comforter, issued after the Plaintiff was directed to show her hands, constitutes a seizure and, if so, was based on probable cause.

The Defendants submit the existence of probable cause constitutes an absolute bar to a § 1983 claim for false arrest (seizure). (Doc. 51, p. 21). *See Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998). Accordingly, for the Plaintiff to prevail on this claim, she must show that no reasonably objective police officer would have perceived there to be probable cause based on the totality of the circumstances. *Coffin v. Brandau*, 642 F.3d 999, 1006 (11th Cir. 2011). And the Defendants submit that an officer who makes an arrest or detention without actual probable cause is nonetheless entitled to qualified immunity in a § 1983 action if there was "arguable probable cause" for the arrest. *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010); *Ferraro*, 284 F.3d at 1195; *Coffin*, 642 F.3d at

---

[16] The Plaintiff also argues the City of Winter Park is liable for negligence because officers violated the City's SOP for conducting a Baker Act involuntary examination. (Doc. 68, p. 24). That said, the Third Amended Complaint does not present a negligence claim against the City of Winter Park, rendering the Plaintiff's argument moot.

1006. "Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present." *Crosby*, 394 F.3d at 1332; *see also Fish v. Brown*, 838 F.3d 1153, 1167 (11th Cir. 2016).

The parties do not dispute that the Defendant Officers were acting within their discretionary authority, so the Plaintiff must establish that the officers seized her in violation of her clearly established rights. *Piazza*, 933 F.3d at 951. "The Fourth Amendment protects people from unreasonable . . . seizures." *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022) (citing *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011)). "Mental-health seizures are reasonable under the Fourth Amendment when the officer has probable cause to believe that the seized person is a danger to himself or to others." *Id.* "[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to ask whether a reasonable officer could conclude that there was a substantial chance" that the seized person is a danger to himself or to others. *Id.* (citing *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022)). The Plaintiff agrees with this standard of review. (Doc. 68, pp. 22–23). The Plaintiff argues the officers conducting the wellness check failed to ask questions related to her wellbeing and "aggressively escalated" the wellness check into a dangerous situation by yanking the covers from her bed. (*Id.* at p. 23).[17]

---

[17]   The Plaintiff also relies in part upon the Winter Park Police Department's Standard Operating Procedure for conducting a Baker Act procedure. (Doc. 68, p. 24). Even so, the Plaintiff fails

Here the Officers were conducting a wellness check based on Mr. Johnson's report that the "Plaintiff was threatening suicide the prior night, threatened to have a shootout with the cops if the cops ever came, previously overdosed on heroin, was very well armed, threatened suicide by cop before, that their two dogs did not bark when Johnson beat on the door, and had been violent the prior night before Johnson left the home." (Doc. 49, ¶ 2). Upon arriving at the residence SGT Marcum spoke with Mr. Johnson who reiterated that the Plaintiff "had enough guns to start a revolution." (Doc. 50-6, 52:1–10). The communications center called the Plaintiff's telephone, but the Plaintiff did not pick up. (Doc. 50-3, 44:5–21, 62:5–16). SGT Marcum knocked on the door of the home and looked through windows, but there was no response. (*Id.* 50:14–24). Before officers entered the home, they announced Winter Park Police, and they repeated the announcement once inside. (*Id.* 84:21–85:1, 103:14–25). SGT Marcum entered the bedroom and instructed the Plaintiff to show him her hands. (*Id.* 104:3–14).

In her sworn affidavit, the Plaintiff acknowledges "hearing a voice ask me to show my hands, and I did. . . . Believing the person was Dean Johnson and since I had no other indication of who was in my bedroom or if I was dreaming, I quickly put my hands back under the comforter."[18] (Doc. 66-1, ¶ 33). The Plaintiff attests

---

to identify precedent holding the failure to comply with a police department's procedures is germane to the issue of probable cause.

[18]   As discussed above, the Plaintiff admits in a recorded telephone call with her mother that she "heard police or something." (Doc. 76-2, at 9:33–37). In her post-*Miranda* interview, the Plaintiff admitted she thought Orlando Police Department had announced their presence after officers entered her home. (Doc. 56-17, at 6:15, 13:45).

that "[w]ithout warning, someone pulled the comforter from my bed, exposing my body and I really felt violated." (*Id.* ¶ 34).[19]

The Court finds the following cases to be instructive in reaching the conclusion that the Defendant Officers did not violate the Plaintiff's Fourth Amendment right to be free from an unlawful seizure or detention. In *Ingram v. Kubik*, the Court found the deputy had probable cause to believe Kubik was a danger to himself where the deputy was dispatched in response to a 911 call for a possible suicide attempt. 30 F.4th at 1250. By the time the officer arrived at the scene, Kubik had cut himself with a knife and exhibited erratic behavior by evading deputies and running into a cotton field. *Id.* The Court found that given these facts, Deputy Kubik was not required to believe the suspect's assurances that he no longer desired to harm himself. *Id.* (citing *District of Columbia v. Wesby*, 138 S.Ct. 577, 588 (2018)).

Here the Defendant Officers received information from the Plaintiff's boyfriend that she was suicidal, heavily armed, and threatened suicide by cop. Law enforcement tried to contact her by telephone to no avail, and then they resorted to banging on the door without response. Officers announced their presence before encountering the Plaintiff. When asked to show them her hands, the Plaintiff was

---

[19] This Circuit has enumerated "a non-exclusive list of factors that may indicate an arrest: 'the blocking of an individual's path or the impeding of his progress; the display of weapon; the number of officers present and their demeanor; the length of the detention; and the extent to which the officers physically restrained the defendant.'" *United States v. Vasquez-Ortiz*, 344 F. App'x 551, 553 (11th Cir. 2009) (citing *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)). While it is debatable that briefly pulling down a comforter constitutes a seizure or detention, the Defendants do not challenge that their conduct, viewed individually or collectively, constituted a seizure of the Plaintiff.

uncooperative, causing SGT Marcum to direct LT Bologna to pull the comforter down at which time the Plaintiff was found to have a firearm in her hand. While the Plaintiff claims her poor vision and use of prescription drugs caused her to be confused, probable cause is judged from the perspective of a reasonable law enforcement officer—not from the Plaintiff's perspective. Moreover, while the Plaintiff criticizes the Defendant Officers for not fact-checking Mr. Johnson's claims, nothing in the record suggests the Officers acted unreasonably in relying on Mr. Johnson's statements.

Similarly, in *Roberts v. Spielman*, 643 F.3d 899, 906 (11th Cir. 2011), a deputy was dispatched in response to a 911 call for a possible suicide attempt, and a relative stated he had been unable to get a response from the subject for an hour. The deputy loudly knocked on the door repeatedly, and the subject did not respond. *Id.* The Court found there was nothing in the record to suggest the deputy should have doubted the information he had been provided on the subject's mental state. *Id.* Based on this information and the subject's belligerent behavior upon being confronted by the deputy, the Court held the seizure was lawful. *Id.* The Court further noted that "even assuming *arguendo* a constitutional violation, a reasonable officer in Deputy Spielman's shoes would not have known that probable cause and exigent circumstances immediately evaporate once an officer performing a welfare check for a possibly suicidal person sees that the person is merely alive." *Id.* In this case, the Plaintiff was uncooperative when instructed to show her hands, placing one back under the covers which prompted the order to

remove the comforter. The Plaintiff's argument that the Defendant Officers should have departed once they found her alive goes against the Court's analysis in *Roberts v. Spielman. See id.*; (Doc. 68, pp. 13–14).

Finally, in *May v. City of Nahunta*, 846 F.3d 1320, 1324–25 (11th Cir. 2017), the Court addressed "whether an otherwise authorized mental-health seizure was converted into an unconstitutional one by virtue of the seizing law enforcement officer's conduct." Plaintiff May was the sole caregiver for her mother and struggled with mental health issues of her own. *Id.* at 1325. When May was found unresponsive, EMTs were called and roused her by placing an ammonia capsule under her nose. *Id.* Around the same time, Officer Allen received a call from 911 requesting his assistance at May's residence. *Id.* An EMT informed Officer Allen that May had "been a little combative" and "had been clasping her fists and 'scruffing and hitting herself in the head.'" *Id.* Officer Allen entered May's bedroom to investigate and while conducting a mental-health seizure asked the EMTs to leave the room. *Id.* Once they left, Officer Allen informed May she was being transported to a hospital and instructed her to change into more suitable clothing. *Id.* Over the course of twenty minutes, Officer Allen touched May's shoulder roughly in an attempt to remover her nightgown, and he pointed to his weapon when instructing her to remove her shorts and put on undergarments. *Id.* at 1326.

The Court found May was seized during the alleged incident. *Id.* at 1328. The Court next addressed "whether the seizure 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* The Court

concluded that "at its inception, Officer Allen's action in seizing May for a psychological evaluation was justified." *Id*. That is, based on the facts Officer Allen had arguable probable cause to seize May. *Id*. As in *May*, the Plaintiff here was reported to be experiencing serious mental health issues which posed a danger to herself. And, like *May*, a reasonable police officer could view the Plaintiff's action in placing her hands back under the covers as combative. It is irrelevant to the analysis that the Plaintiff may have mistakenly believed the order to show her hands had been issued by Mr. Johnson and not the police. Therefore, when viewed in the context of the reported suicide by cop threat and the Plaintiff's failure to respond to banging on her door, her failure to follow the command to remove her hand from under the covers provided the Defendant Officers with probable cause to believe a there was a substantial chance the Plaintiff was a danger to herself or to others. And, unlike *May*, the seizure was brief and given the circumstances does not evidence a disregard for the Plaintiff's personal dignity so as to be unreasonable.

For these reasons, the Defendants' Motion for Summary Judgment as to SGT Marcum (Count II), LT Bologna (Count V), Officer Eller (Count VI), and Officer Pushor (Count VIII) is granted.

## IV.   CONCLUSION

For these reasons, it is **ORDERED** and **ADJUDGED** as follows:

1.      Defendants' Motion for Summary Judgment (Doc. 51) is **GRANTED**.

2.      The Court reserves jurisdiction to consider the award of reasonable attorney's fees to the prevailing party pursuant to 42 U.S.C. § 1988.

3.      The Clerk of Court is **DIRECTED** to close the file.

**DONE AND ORDERED** in Orlando, Florida on July 7, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties